**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **KATHERINE HARTMAN** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **SELECT REHABILITATION, LLC** | : | **NO.  20-1872** |

**MEMORANDUM OPINION**

Savage, J.                                                                                      **March 25, 2021**

Plaintiff Katherine Hartman brings this action against her former employer Select Rehabilitation, LLC for age discrimination under the Age Discrimination in Employment Act ("ADEA") and the Pennsylvania Human Relations Act ("PHRA"). Select eliminated one of two occupational therapist positions at its Towne Manor East facility as part of a reduction-in-force and terminated[1] Hartman while retaining a significantly younger occupational therapist for the remaining full-time position. Hartman claims Select's decision was motivated by her age.

Moving for summary judgment, Select argues that the elimination of an occupational therapist position was part of a company-wide reduction-in-force, and it retained Rachel Urbanski, the younger occupational therapist, instead of Hartman because Urbanski had superior leadership potential, clinical performance and documentation. Hartman has produced evidence suggesting that Select's proffered legitimate, non-discriminatory reason for its employment decision is pretext for age discrimination. Because there are disputed issues of fact and credibility that must be determined by a jury, we shall deny Select's motion for summary judgment.

---

[1] Hartman claims she was terminated. Select claims Hartman resigned after being reduced from full-time to part-time *pro re nata* status. We shall refer to Hartman's separation from full-time employment as "elimination" or "reduction" in this opinion.

### Factual Background

Plaintiff Katherine Hartman, who was born on March 12, 1969, graduated from Temple University with a bachelor of science degree in occupational therapy in 1996.[2] Since 1996, she has worked as an occupational therapist, except for brief times following the birth of her two children.[3] She is a licensed occupational therapist.[4]

From 2013 to 2016, Hartman worked as a full-time occupational therapist for Accomplish Therapy at Towne Manor East, one of the facilities where Accomplish provided therapy services.[5] When Select acquired Accomplish in 2016,[6] Hartman was grandfathered into her position with Select at Towne Manor East.[7] Her hourly rate was $50[8] and was later adjusted to $51.[9]

Rachel Urbanski, born on October 5, 1992, joined Select as a full-time occupational therapist in 2017.[10] She graduated from Temple University with bachelor of science and master's degrees in occupational therapy earlier that year.[11] When Urbanski

---

[2] Def.'s Mot. for Summ. J. Ex. 1 at 9:15-16, 10:14-18 (ECF No. 21) ("Hartman Deposition Transcript"). Hartman does not possess a master's degree because an advanced degree was not required for licensure in 1996. *Id.* at 123:5-23. Now a master's degree is required. *Id.*

[3] *Id.* at 11:5-16.

[4] *Id.* at 12:17-18.

[5] *Id.* at 15:2-16:1.

[6] *Id.* at 15:24-16:1.

[7] *Id.* at 16:2-19.

[8] Def.'s Mot. for Summ. J. Ex. 2.

[9] Hartman Dep. Tr. at 54:1-54:23; Def.'s Mot. for Summ. J. Ex. 4 at 87:23-88:10 ("Davis Deposition Transcript").

[10] Pl.'s Resp. to Def.'s Mot. for Summ. J. Ex. D at 9:10-12, 9:18-22, 11:10-14, 22:11-24 (ECF No. 22) ("Urbanski Deposition Transcript"); Davis Dep. Tr. at 62:13-18.

[11] Urbanski Dep. Tr. at 50:7-16, 51:1-5; Davis Dep. Tr. at 87:3-5, 94:13-14.

started with Select, she split her time between Towne Manor East and another facility, Suburban Woods.[12] She also worked at two nearby facilities, Towne Manor West and Silver Lake.[13] She began working full-time at Towne Manor East in July 2018, when Suburban Woods switched from Select to another therapy provider.[14] Her hourly rate is $38.[15]

Hartman and Urbanski were the only full-time occupational therapists at Towne Manor East.[16] Their direct supervisor was Heather Macalis, a licensed occupational therapist and the Program Manager at Towne Manor East.[17] Macalis reported to Shelley Serene, the regional manager of seven facilities serviced by Select.[18] Serene reported to Kelli Davis, the divisional vice president overseeing 52 facilities serviced by Select in Pennsylvania, Massachusetts and Florida.[19]

Hartman claims that while working for Accomplish and later Select, she was the backup Program Manager for Towne Manor East when Macalis was unable to attend a meeting.[20] Katie Milks, a licensed Physical Therapy Assistant ("PTA") and the backup Program Manager at Towne Manor West, corroborated that Hartman was the backup

---

[12] Urbanski Dep. Tr. at 27:2-8, 27:21-28:13.

[13] *Id.* at 27:6-8; Davis Dep. Tr. at 67:14-15.

[14] Davis Dep. Tr. at 155:22-156:9.

[15] Urbanski Dep. Tr. at 26:20-22.

[16] Hartman Dep. Tr. at 71:21-22.

[17] *Id.* at 49:12-18; Urbanski Dep. Tr. at 11:22-12:5; Davis Dep. Tr. at 33:7-18, 44:24-45:3.

[18] Hartman Dep. Tr. at 49:22-50:5; Davis Dep. Tr. at 16:20-21, 17:16-21.

[19] Hartman Dep. Tr. at 50:6-8; Davis Dep. Tr. at 15:23-16:12, 16:18-19.

[20] Hartman Dep. Tr. at 17:24-19:7. Hartman referred to the role as "Director of Rehabilitation." *Id.*

Program Manager at Towne Manor East, followed briefly by Niketa Patel, a physical therapist.[21] As the back-up Program Manager, Hartman attended meetings with other department heads on Macalis's behalf and relayed information back to the Rehabilitation Department.[22] Her nickname among the employees was "Assistant Director of Rehabilitation," though she never held an official title of "director" or "manager."[23]

Davis disputed that Hartman was the backup Program Manager after Select acquired Accomplish in 2016.[24] According to Davis, Niketa Patel was the backup Program Manager at Towne Manor East in 2019, and Urbanski became the backup Program Manager in January 2020.[25] She claimed that her search of records of backup Program Managers accessing Casamba, Select's computer software program, showed that Hartman was never granted such access.[26] Davis was not aware that employees sometimes referred to Hartman as Assistant Director of Rehabilitation.[27]

As occupational therapists, Hartman and Urbanski were required to complete and submit treatment documentation to Casamba.[28] The documentation included evaluation forms, recertifications, discharge summaries, progress notes and daily notes.[29] Certified

---

[21] *Id.* at 71:20; Pl.'s Ex. L at ¶¶ 5-9 ("Milks Decl.").

[22] Hartman Dep. Tr. at 17:24-19:7.

[23] *Id.* at 19:7-16, 67:7-16.

[24] Davis Dep. Tr. at 47:10-13, 92:16-24.

[25] *Id.* at 46:23-47:7, 91:3-13, 93:1-8.

[26] *Id.* at 47:14-19, 51:16-21, 92:16-24.

[27] *Id.* at 11:9-20, 69:7-9.

[28] Urbanski Dep. Tr. at 72:9-16; Hartman Dep. Tr. 118:6-14; Davis Dep. Tr. at 38:14-17.

[29] Urbanski Dep. Tr. at 68:2-5; Hartman Dep. Tr. 118:9-14. Evaluations present a direct plan of care for a patient based on the patient's chart and interviews, including goals and therapy services the patient will receive. Urbanski Dep. Tr. at 69:21-70:3. Discharge summaries discuss the patient's progress towards

Occupational Therapy Assistants ("COTAs") are qualified to complete daily notes, but only occupational therapists can complete the other documents.[30]

Although Select does not conduct formal performance reviews of its therapists, it completes quarterly audits of their documentation to ensure they are meeting standards.[31] As part of the audit, Select randomly chooses evaluations, discharge summaries and progress notes for review.[32] After each audit, Serene reviews the audit with the therapists and provides follow-up education for complying with Select's documentation standards.[33] Macalis and Serene also observe the therapists during sessions with patients and pass on their evaluations of the therapists' performance to higher level management.[34]

Hartman never received a negative evaluation for her documentation or treatment of patients.[35] Neither she nor Urbanski had any disciplinary history at Select.[36]

---

their goals and include a discharge recommendation. *Id.* at 73:20-74:9. Recertifications concern whether a patient needs continued services. *Id.* at 75:11-17. Progress notes summarize the patient's progress over the past few weeks, whereas daily notes summarize the therapy services the patient received on a given day. *Id.* at 68:6-15.

[30] *Id.* at 68:16-69:9; Davis Dep. Tr. at 85:14-20.

[31] Hartman Dep. Tr. at 106:5-19; Davis Dep. Tr. at 19:3-5; Urbanski Dep. Tr. at 62:22-63:21.

[32] Hartman Dep. Tr. at 106:5-19.

[33] Davis Dep. Tr. at 77:20-79:22.

[34] Hartman Dep. Tr. at 106:20-107:14; Davis Dep. Tr. at 79:23-81:19.

[35] Hartman Dep. Tr. at 107:15-19, 119:2-17.

[36] Davis Dep. Tr. at 70:11-23; Urbanski Dep. Tr. at 66:20-22.

Under Medicare's new Patient Driven Payment Model ("PDPM"), therapists can now provide therapy services in groups and no longer have to provide therapy one-on-one.[37] These changes allowed providers to bill more services using fewer therapists.[38]

To prepare for the transition to the new PDPM system on October 1, 2019, Davis and Serene met with the staffs at Towne Manor East and Towne Manor West in the summer of 2019.[39] Hartman and Milks claimed Davis told the staff that no one had to worry about losing their jobs.[40] Davis denied ever telling the staff at Towne Manor East or West that their jobs were safe.[41]

Select decided to implement a company-wide reduction-in-force in anticipation of the PDPM system.[42] Select determined that it no longer needed two occupational therapists at Towne Manor East.[43] In mid-September 2019, Serene informed Hartman that her full-time position was being eliminated.[44] She told Hartman that "it was an HR decision" and was "nothing personal."[45] Urbanski remained in her full-time position.[46]

---

[37] Davis Dep. Tr. at 83:12-17.

[38] *Id.* at 83:24-84:17.

[39] Hartman Dep. Tr. at 24:4-12, 26:11-15.

[40] *Id.* at 24:12-25:4, 25:10-17; Milks Decl. at ¶¶ 10-11.

[41] Davis Dep. Tr. at 146:10-13.

[42] *Id.* at 57:3, 58:18-59:2.

[43] *Id.* at 73:23-74:3, 82:9-12.

[44] Hartman Dep. Tr. at 68:15-69:2, 75:18- 76:8.

[45] *Id.* at 76:11-14.

[46] Davis Dep. Tr. at 32:24-33:14.

As part of the reduction-in-force, Hartman was switched to a part-time, *pro re nata* ("PRN") role at the end of September 2019.[47] PRNs are used to fill in for a member of the full-time staff on vacation or out sick.[48] As a PRN, Hartman was on a list of temporary staff to call in as needed.[49] PRNs do not receive health insurance.[50] They have no schedule and are not guaranteed a number of hours.[51] As a PRN, Hartman's hourly rate decreased to $48.[52]

After speaking with Serene, Hartman learned that although some staff at the Towne Manor facilities were eliminated or reduced to part-time work, others were retained with a pay cut.[53] She asked Serene if she could remain in a full-time position with a pay cut.[54] Macalis offered to take a pay cut so Hartman could be retained full-time.[55] Hartman claims that Serene refused, but offered her a full-time position in Florida.[56] Davis, Serene's supervisor, denied that Hartman was offered a position in Florida.[57]

---

[47] Hartman Dep. Tr. at 78:20-79:5.

[48] Davis Dep. Tr. at 85:3-5.

[49] *Id.* at 33:24-34:2, 34:24-35:6; Hartman Dep. Tr. at 21:14-19.

[50] Davis Dep. Tr. at 55:23-56:1.

[51] *Id.* at 56:2-56:6.

[52] Hartman Dep. Tr. at 89:1-2.

[53] *Id.* at 76:21-77:2, 79:14-18, 93:24-94:10. The employees who were retained with pay cuts were Jennie, a physical therapist in her mid to late thirties, Kate, a PTA in her late thirties, Judy, a COTA in her fifties, and Susan, an occupational therapist in her late fifties. *Id.* at 94:11-96:6.

[54] *Id.* at 76:21-78:8, 112:4-14; Davis Dep. Tr. at 136:10-14.

[55] Hartman Dep. Tr. at 112:20-22.

[56] *Id.* at 78:9-12, 112:15-20; Davis Dep. Tr. at 136:15-19.

[57] Davis Dep. Tr. at 157:4-5. There is no other evidence of the offer in the record. Serene was unavailable for deposition due to a health diagnosis. *Id.* at 16:24-17:14.

Towne Manor East reduced its occupational therapy team from two full-time employees – Urbanski and Hartman – to one full-time employee and one half-time employee – Urbanski and Macalis.[58] Though Macalis was a manager, the PDPM system reduced her administrative burdens, enabling her to conduct more patient treatment.[59] Hartman's duties were divided among Urbanski, Macalis and the COTAs.[60]

Three other Towne Manor staff members suffered adverse employment actions. Mike, a physical therapist in his mid-thirties, and Kendra, a PTA who is 30, were terminated.[61] Shiney, an occupational therapist at Towne Manor West who is around 40, was switched from full-time to part-time.[62]

Select has moved for summary judgment, arguing that Hartman was eliminated as part of a company-wide reduction-in-force, and that no reasonable jury could conclude the elimination of her job resulted from age discrimination.[63]

### Legal Standard

Summary judgment is appropriate "if the movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). Judgment will be entered against a party who fails to sufficiently establish any element essential to that party's case and who bears the ultimate burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In examining the motion, we

---

[58] *Id.* at 32:24-33:18.

[59] *Id.* at 83:5-10.

[60] *Id.* at 85:6-13.

[61] Hartman Dep. Tr. at 97:8-23, 120:15-19.

[62] *Id.* at 96:7-14, 120:21-22.

[63] *See* Def.'s Mot. for Summ. J.

must draw all reasonable inferences in the nonmovant's favor. *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 159-60 (3d Cir. 2003).

Disagreements over what inferences may be drawn from the facts, even undisputed ones, preclude summary judgment. *Ideal Dairy Farms, Inc. v. John Labatt, Ltd.*, 90 F.3d 737, 744 (3d Cir. 1996) (citation omitted). Credibility determinations, the drawing of legitimate inferences from facts, and the weighing of evidence are matters left to the jury. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986).

A party moving for summary judgment may use depositions and affidavits or declarations to show a fact is not genuinely disputed, and a party opposing the motion may also rely on them to demonstrate that a fact is disputed. *See* FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record, including depositions . . . affidavits or declarations."). Because depositions provide all parties an opportunity to probe the witness, they are preferred to declarations and affidavits that are generally prepared by attorneys rather than the declarant or affiant. *See In re CitX Corp.,* 448 F.3d 672, 680 (3d Cir. 2006) (citing 10A Charles Alan Wright et al, *Fed. Prac. & Proc.* § 2722, at 373, 379 (3d ed. 1998)). The affiant must set forth specific facts that reveal a genuine issue of material fact. *Lujan v. National Wildlife Fed'n,* 497 U.S. 871, 888 (1990) (collecting cases). Because they are not subject to cross-examination, affidavits are scrutinized carefully. *In re CitX Corp.,* 448 F.3d at 680 (citing 10A Charles Alan Wright et al, *Fed. Prac. & Proc.* § 2722, at 373, 379).

## Discussion

Because Hartman is proceeding under a pretext theory and does not present any "direct evidence" of discrimination, her claims are governed by the burden-shifting *McDonnell Douglas* analysis. *Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 511 (2002); *Starceski v. Westinghouse Electric Corp.,* 54 F.3d 1089, 1096, n. 4 (3d Cir.1995). Under the burden-shifting *McDonnell Douglas* analysis, Hartman must first establish a *prima facie* case of discrimination based on her age. *Martinez v. UPMC Susquehanna*, 986 F.3d 261, 266 (3d Cir. 2021) (citations omitted); *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). Establishing a *prima facie* case of discrimination "is not onerous and poses a burden easily met." *Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 365 (3d Cir. 2008) (internal quotation marks omitted) (quoting *Tex. Dep't of Corr. Affs. v. Burdine*, 450 U.S. 248, 253 (1981)).

If the plaintiff fails to establish a *prima facie* case, the defendant is entitled to judgment as a matter of law. The determination of whether a *prima facie* case has been established is, under most circumstances, a question of law for the court. *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 347 n.1 (3d Cir. 1999).

If she succeeds in establishing a *prima facie* case, the burden shifts to the defendant to "'articulate a legitimate nondiscriminatory reason for the adverse employment action.'" *Willis v. UPMC Children's Hosp. of Pitts.*, 808 F.3d 638, 644 (3d Cir. 2015) (quoting *Jones v. Sch. Dist. of Phila.,* 198 F.3d 403, 412 (3d Cir. 1999)) (further citations omitted). The defendant's burden is "relatively light." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013). It can satisfy its burden by "introducing evidence which, taken as true, would permit the conclusion that there was a non-discriminatory reason for

the unfavorable employment decision." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). The defendant's burden is one of "production, . . . not of persuasion." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1123–24 (9th Cir. 2000). It "need not prove that the tendered reason *actually* motivated" its decision. *Fuentes*, 32 F.3d at 763 (emphasis in original). It need only show that its decision could have been motivated by the proffered legitimate, non-discriminatory reason. *Id.*; *Iadimarco v. Runyon*, 190 F.3d 151, 157 (3d Cir. 1999).

If the defendant satisfies its burden, the plaintiff must produce evidence from which a reasonable factfinder could conclude that the proffered reason for taking the adverse action was merely a pretext for intentional discrimination. *Willis*, 808 F.3d at 644 (citing *Burton*, 707 F.3d at 426–27). The final burden of production "merges with the ultimate burden of persuading [the jury] that [he] has been the victim of intentional discrimination." *Burdine*, 450 U.S. at 256.

To establish a *prima facie* case of typical age discrimination, a plaintiff must show: (1) she is at least 40 years old; (2) she suffered an adverse employment decision; (3) she was qualified for her position; and (4) she was ultimately replaced by another employee who was sufficiently younger so as to support an inference of a discriminatory motive. *Willis*, 808 F.3d at 644 (citations omitted).

There is no dispute that Hartman has satisfied the first and third elements of the *prima facie* case. She was 50 years old. She was qualified for her position as an occupational therapist.[64]

---

[64] Hartman Dep. Tr. at 121:4-10.

The dispute is over the second and fourth elements. The parties disagree that Hartman suffered an adverse employment action and that Select used age as a factor in deciding to terminate Hartman, giving rise to an inference of age discrimination.

An "adverse employment action" is "one which is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Cardenas v. Massey*, 269 F.3d 251, 263 (3d Cir. 2001) (internal citation and quotation marks omitted). What qualifies as an adverse employment action is broader than the statutory definition. It includes "'firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits,'" *Remp v. Alcon Labs., Inc.*, 701 F. App'x 103, 106–07 (3d Cir. 2017) (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)); reassigning an employee to a "dead-end" position that was soon eliminated, *Torre*, 42 F.3d at 831; giving an employee a potentially less profitable sales position, *Goosby v. Johnson & Johnson Med., Inc.*, 228 F.3d 313, 319 (3d Cir. 2000); failing to rehire someone, *Sarullo v. USPS*, 352 F.3d 789, 800 (3d Cir. 2003); and revoking a person's office, dismissing her secretary, and assigning her less work, *Durham Life Ins. Co. v. Evans*, 166 F.3d 139, 153–54 (3d Cir. 1999). On the other hand, lateral transfers or changes in title absent evidence of a material change in an employee's working conditions generally do not constitute adverse employment actions. *Fiorentini v. William Penn Sch. Dist.*, 665 F. App'x 229, 234 (3d Cir. 2016) (citations omitted). *See also Daniels v. Sch. Dist. of Phila.*, 982 F. Supp. 2d 462, 479 (E.D. Pa. 2013), *aff'd.* 776 F.3d 181 (3d Cir. 2015) (To constitute an adverse employment action, transfers must "be detrimental or undesirable in some objective way").

Hartman claims she was terminated. Davis contends she resigned after she was switched to PRN status. Whether Hartman resigned or was terminated, she suffered an adverse employment action when her full-time employment was changed to occasional PRN work. PRNs are placed on an on-call list to cover for an employee who is out sick or on vacation. PRNs receive no benefits, no health insurance, no routine schedule and no guaranteed minimum hours.[65] Hartman's hourly rate decreased from $51 to $48.[66] These changes in Hartman's job amount to an adverse employment action.

Select argues that it offered Hartman employment in Florida and she rejected it, demonstrating that Hartman did not suffer an adverse employment action.[67] Hartman contends there is no evidence of a formal offer of employment.[68] Whether Hartman was offered a position in Florida is an open question. Hartman testified that Serene offered her the position when she informed Hartman of the reduction. Davis, Serene's supervisor based in Florida, knew nothing of an offer.[69] Select's formal letter notifying Hartman of her reduction only states that Hartman will switch to PRN status. It contained nothing about an alternative placement in Florida.[70]

In any event, if an offer was made, there is no evidence that the alternative Florida position was comparable to Hartman's previous position. There is no evidence of the job

---

[65] *Id.* at 21:14-19; Davis Dep. Tr. at 33:24-34:2, 34:24-35:6, 55:23-56:6.

[66] Hartman Dep. Tr. at 89:1-2.

[67] Def.'s Mot. for Summ. J. at 17-18.

[68] Pl.'s Resp. at 11.

[69] *Id.* Select has since adopted the position that it made an offer to Hartman, which Hartman now denies.

[70] Pl.'s Resp. Ex. H.

title, hours, rate of pay, benefits or any other details. Consequently, there is insufficient information necessary to inform whether the offer was a lateral transfer or a materially different job assignment.

Whether a transfer or reassignment is an adverse employment action depends on the circumstances of the case. Because it calls for a factual determination, it is a jury question. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 71 (2006) (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)) ("Whether a particular reassignment is materially adverse depends upon the circumstances of the particular case, and 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances.'") (internal quotations and citations omitted). *See also Washco v. Federal Express Corp.,* 402 F. Supp. 2d 547, 558 (E.D. Pa. 2005) ("[A] plaintiff can survive summary judgment without alleging a reduction in pay or benefits, provided that the plaintiff alleges other facts demonstrating that the transfer was in some way adverse"). Having shown the material changes in demoting her from full-time to PRN status, Hartman has satisfied the adverse employment action element.

Satisfying the fourth *prima facie* element in a reduction-in-force age discrimination case requires more than what is required in a typical age discrimination case. *Monaco v. Am. Gen. Assur. Co.*, 359 F.3d 296, 301 (3d Cir. 2004) (citing *Anderson v. Consol. Rail Corp.*, 297 F.3d 242, 249-50 (3d Cir. 2002)). The plaintiff in a reduction-in-force case cannot establish the fourth element by showing only that a younger worker was retained and she was not. Rather, she must also show that the younger employee was similarly situated to her. *Anderson*, 297 F.3d at 250.

Hartman argues that we should follow the traditional *prima facie* standard. According to Hartman, Select did not implement a "genuine" reduction-in-force because the reduction was not caused by a decline in business.[71] A reduction-in-force can result from any number of factors. Although a reduction-in-force often occurs when an employer is experiencing a decline in business or other economic hardship, it is not limited to those circumstances. It may arise where technology or other changes to the industry or workplace enabled the employer to reduce its workforce. The Third Circuit has applied the reduction-in-force *prima facie* standard in contexts where the employer implemented the reduction to address changing business needs, not economic hardship. *See Muhammad v. Sills Cummis & Gross P.C.*, 621 F. App'x 96, 99-101 (3d Cir. 2015) ("[A]t no time did Sills Cummins claim that economic hardship motivated its decision to reduce the Operations Department. Rather . . . the layoffs were due to changing business needs based on, among other things, technological developments such as the predominant use of emails as opposed to faxes, which Operations employees once hand-delivered.").

Select argues Hartman cannot establish the fourth element of the *prima facie* case. Davis claimed she did not know Hartman's age when she and Serene made the decision to reduce her to PRN status.[72] Because Davis did not learn Hartman's age until this litigation began, Select argues, she could not have discriminated against her on the basis of age.[73] Davis and Serene, the alleged decisionmakers, both met Hartman and Urbanski

---

[71] Pl.'s Resp. at 6.

[72] Def.'s Mot. for Summ. J. at 17.

[73] *Id.*

in person.[74] Though Davis and Serene may not have known Hartman and Urbanski's exact ages, the more than twenty year age gap was obviously apparent.[75] Select's contention that Davis did not know their relative ages is disingenuous.

To support its claim that age was not a factor, Select contends it retained employees of Hartman's age and older while reducing others under 40 years old.[76] According to Select, Hartman focuses on Urbanski and ignores that other older employees were retained. It points to Susan, an occupational therapist in her late fifties at Towne Manor West; Macalis, the 48 year-old Program Manager at Towne Manor East; and Judy, a COTA in her fifties.[77] Select furloughed Mike, a physical therapist, and Kendra, a PTA, who are both in their thirties.[78] Select contends these reductions show that younger employees were not treated more favorably during the reduction-in-force.[79]

Factors demonstrating that two employees are similarly situated include "a showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (internal quotations and citations omitted). *See also In re Trib. Media Co.*, 902 F.3d 384, 403 (3d Cir. 2018)

---

[74] Pl.'s Resp. at 9; Davis Dep. Tr. at 61:22-62:7, 153:16-21; Hartman Dep. Tr. at 51:13-18, 98:3-98:9; Urbanski Dep. Tr. at 16:19-18:3, 66:6-19.

[75] Pl.'s Resp. at 9-10.

[76] Def.'s Mot. for Summ. J. at 15-17.

[77] *Id.* at 16-17.

[78] *Id.* at 16.

[79] *Id.* at 15.

(Former employee "must show that Schultz was 'similarly[ ]situated in all respects'—in other words, he 'dealt with the same supervisor, . . . [was] subject to the same standards[,] and ... engaged in the same conduct") (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). Courts "look to the job function, level of supervisory responsibility and salary, as well as other factors relevant to the particular workplace." *Monaco,* 359 F.3d at 305. *See also Anderson*, 297 F.3d at 250 (describing similarly situated employees as those where "the duties were comparable or . . . they were otherwise similarly situated"); *Lepore v. Lanvision Sys., Inc.,* 113 F. App'x 449, 452 (3d Cir. 2004) (citing *Anderson*, 297 F.3d at 250) (similarly situated employees "work in the same area in approximately the same position"). *Cf. Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013) (plaintiff was not similarly situated to other employees working in different positions in different departments).

It is undisputed that Select retained a substantially younger, similarly situated employee instead of Hartman in the occupational therapist position.[80] Urbanski, 27, and Hartman, 50, were both full-time occupational therapists at the same facility with the same title, job description and supervisor.[81]

Hartman is comparing herself to other similarly situated employees. Though "similarly situated" does not mean "identically situated," the employees "must nevertheless be similar in all relevant respects." *Opsatnik*, 335 F. App'x at 222–23 (internal quotations and citations omitted). Urbanski and the two other occupational therapists at Towne Manor West, Susan and Shiney, are similarly situated to Hartman.

---

[80] Pl.'s Resp. at 8.

[81] *Id.*

As full-time occupational therapists at the Towne Manor facilities, they perform similar job functions with similar responsibilities. On the other hand, Mike, Judy and Kendra are not similarly situated. Mike is a physical therapist, Judy is a COTA and Kendra is a PTA. There is no evidence that they perform functions or have responsibilities similar to Hartman.[82] Though Macalis is an occupational therapist by training, she is the Program Manager who oversaw Hartman and Urbanski. In addition to treating patients, her duties include administrative and supervisory tasks.[83] By pointing to these individuals, Select appears to ignore the "similarly situated" requirement of the reduction-in-force *prima facie* case.

There is no bright line age difference to satisfy the "sufficiently younger" requirement. *Showalter*, 190 F.3d at 236 (quoting *Sempier v. Johnson & Higgins,* 45 F.3d 724, 729 (3d Cir. 1995)) (citations omitted); *see also Barber v. CSX Distribution Servs*., 68 F.3d 694, 699 (3d Cir. 1995) ("There is no magical formula to measure a particular age gap and determine if it is sufficiently wide to give rise to an inference of discrimination."). "[W]hile '[d]ifferent courts have held . . . that a five year difference can be sufficient, . . . a one year difference cannot.'" *Id.* (citing *Sempier*, 45 F.3d at 729). The age difference must be enough for a fact-finder to reasonably conclude that the employment decision was based on age. *Sempier*, 45 F.3d at 729.

---

[82] For example, COTAs can fill out daily notes, but they are not qualified to complete evaluations, discharges, recertifications, progress notes, or any of the other similar documentation that occupational therapists complete as part of their work. Urbanski Dep. Tr. at 68:16-69:9; Davis Dep. Tr. at 85:14-20.

[83] Davis Dep. Tr. at 45:8-13, 135:1-2.

At 27 years old, Urbanski, the only similarly situated employee who assumed some of Hartman's duties, was sufficiently younger than Hartman.[84] A reasonable factfinder could conclude that Select's decision to retain Urbanski over Hartman, who was 23 years older, was motivated by age discrimination.

Susan's retention as a full-time occupational therapist at Towne Manor West may militate against an inference of age discrimination. Looking at the similarly situated employees, Select's decisions regarding whom to reduce and whom to retain could support a finding of bias favoring younger workers. Of the four occupational therapists at the Towne Manor facilities, two were reduced (Hartman and Shiney) and two were retained (Urbanski and Susan). Hartman, Shiney and Susan are all in the protected class. Urbanski is not. Susan's continued employment does not necessarily rule out that Urbanski was chosen to remain over Hartman because of her age. Drawing all inferences in favor of Hartman as the non-movant, she has established that Select's reduction-in-force discriminated against older workers and her in particular, thus satisfying the fourth element of the *prima facie* case under either the traditional or the reduction-in-force standard.

---

[84] Even if Macalis were similarly situated to Hartman, her age of 48 does not preclude a finding of age discrimination. The combined difference in ages between the plaintiff and the retained employees who took over the plaintiff's duties can raise an inference of age discrimination. *See Sempier*, 45 F.3d at 730 (finding the combined 10-year and 4-year age differences between Sempier and the retained employees "is clearly sufficient to satisfy the fourth prong of a prima facie case"); *Steward v. Sears Roebuck & Co.*, 231 F. App'x 201, 209 (3d Cir. 2007) (denying summary judgment where three employees aged 33, 35 and 60 assumed the 50 year-old plaintiff's duties). The retained employees do not have to be outside the protected class to qualify as "sufficiently younger." *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996) ("The fact that one person in the protected class has lost out to another person in the protected class is thus irrelevant, so long as he has lost out *because of his age.*") (emphasis in original). *See also Healy v. New York Life Ins. Co.*, 860 F.2d 1209 (3d Cir. 1988) (Evidence that the 56 year-old plaintiff was discharged during a reduction-in-force and replaced by a 47 year-old employee was sufficient to establish a *prima facie* case of age discrimination).

To meet its burden in response to Hartman's *prima facie* case, Select has produced evidence of a legitimate, non-discriminatory reason for Hartman's reduction. In 2019, Medicare introduced changes to its regulatory model. Under the new PDPM system, therapy providers like Select were able to deliver services through "group therapy" and "concurrent therapy," with one therapist treating two to six patients at once instead of one-on-one treatment.[85] This model allows Select to bill more hours while employing fewer therapists. As a result, Select decided to reduce staff at some of its facilities. In making their decision to reduce therapists at each location sometime before the changes went into effect on October 1, 2019, Davis and Serene looked at the needs of each facility.[86] They considered each employee's leadership skills, clinical performance and documentation.[87] Davis testified that she and Serene chose to retain Urbanski over Hartman because Urbanski showed greater leadership potential, her documentation was more thorough and her clinical performance was superior.[88] According to Davis, Urbanski was organized, a good multi-tasker and a team player who voluntarily took on extra duties, assisting management in educating the staff about the new PDPM system, and helping out Select at other facilities, such as Suburban Woods, Towne Manor West, and Silver Lake.[89]

---

[85] Davis Dep. Tr. at 52:18-21, 63:19, 83:12-84:17.

[86] *Id.* at 32:12-23, 53:13-15, 58:24-60:7, 98:15-99:4, 154:5-10.

[87] *Id.* at 147:12-21, 149:22-23, 150:15-151:11.

[88] *Id.* at 57:12-58:1.

[89] *Id.* at 58:2-8, 62:19-63:24, 64:12-65:1.

Davis stated that Urbanski's documentation was more thorough and detailed.[90] Medicare requires therapists to complete documentation with patient-specific details, and objective standardized tests and measures to show a patient's progress and outcome.[91] According to Davis, in reviewing progress notes, she found that Hartman's documentation contained inconsistencies regarding one patient's activity tolerance level, another's mobility and another's dressing goal.[92] Davis also claimed Hartman's documentation contained vague and subjective measurements for a patient's goal regarding grip strength.[93] The COTA reviewing the documentation with inconsistencies and subjective notes would not know how to properly treat the patient.[94] In some of her progress notes, Hartman did not list the patient's short term goals, only long-term goals, making it impossible to measure progress.[95] In others, she only listed codes instead of describing the skilled services she provided.[96] According to Davis, unlike Hartman's, Urbanski's documentation for the same patients contained very specific notes about the skilled techniques provided, with objective measurements demonstrating the patient's progress.[97]

---

[90] *Id.* at 76:3-10.

[91] *Id.* at 76:10-77:13.

[92] *Id.* at 112:12-24, 115:10-18, 116:19-117:3.

[93] *Id.* at 118:9-17.

[94] *Id.* at 116:10-13.

[95] *Id.* at 121:10-24.

[96] *Id.* at 122:14-19.

[97] *Id.* at 113:21-114:21, 122:23-123:6.

Select having shown legitimate reasons for eliminating Hartman's full-time position, the burden shifts back to Hartman to discredit Select's proffered justification or present evidence that she was eliminated for a discriminatory reason. *Lupyan v. Corinthian Colleges Inc.*, 761 F.3d 314, 324 (3d Cir. 2014) (citing *Fuentes*, 32 F.3d at 764). A plaintiff may discredit the proffered reason by demonstrating "'such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons' to satisfy the factfinder that the employer's actions could not have been for nondiscriminatory reasons." *Willis*, 808 F.3d at 644–45 (citing *Fuentes*, 32 F.3d at 765). A plaintiff can meet her burden by producing evidence from which a factfinder could conclude that the adverse employment action was more likely than not the result of discrimination. *Id.* at 645 (citing *Fuentes*, 32 F.3d at 764). Examples of such evidence include previous acts of discrimination against the plaintiff, discrimination against other persons within the plaintiff's protected class or within another protected class, or a showing that the defendant has treated similarly situated non-members of the protected class more favorably. *Id.* (citations omitted).

In other words, Hartman must proffer "'evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons . . . or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *In re Trib. Media Co.*, 902 F.3d at 402 (quoting *Fuentes*, 32 F.3d at 762). *See also Willis*, 808 F.3d at 644–45.

Hartman has introduced evidence to suggest Select's legitimate, non-discriminatory reasons are pretext for age discrimination. Hartman has pointed to

22

inconsistencies and weaknesses in Select's justifications for choosing Urbanski over her. Davis claimed Urbanski was a "team player" who was willing to help out at other facilities, but Hartman pointed out that Urbanski began working for Select in a split-shift position where she divided her time between different facilities.[98] Hartman also worked as an occupational therapist at Suburban Woods.[99] Davis praised Urbanski's leadership potential, citing her assistance with Select's PDPM education. Urbanski did not recall Select giving its staff any PDPM education.[100] Milks stated that the therapy staffs at the Towne Manor facilities were never informed that Urbanski had any role with PDPM education.[101] Urbanski may have become the backup Program Manager, but only after Hartman was reduced to PRN status.

Although Davis claimed that leadership potential, clinical performance and documentation "weighed equally" in Select's decision, she stated that the decision was based "primarily" on documentation.[102] Additionally, although Davis claimed "clinical performance" was a factor, there is no evidence to suggest Hartman's clinical performance was any different than Urbanski's. Davis admitted that Select did not conduct performance reviews. Both Serene and Davis were absent from Towne Manor East. Serene is based in upstate Pennsylvania; and Davis, in Jupiter, Florida.[103] Serene

---

[98] *Id.* at 67:4-6, 156:4-9.

[99] *Id.* at 156:19-24.

[100] Urbanski Dep. Tr. at 85:22-25.

[101] Milks Decl. at ¶ 12.

[102] Davis Dep. Tr. at 74:9-75:6.

[103] Hartman Dep. Tr. at 50:13-14; Davis Dep. Tr. at 9:5-8.

visits the facilities she oversees, including Towne Manor East, about ten to twenty times a year.[104] Davis visits Towne Manor East approximately three to five times a year.[105]

Although Serene and Macalis observed Hartman and Urbanski in therapy sessions at various times, neither recorded any negative feedback regarding Hartman or Urbanski. Although Davis testified in detail about purported deficiencies in Hartman's documentation compared to Urbanski's, it is for the jury to compare Urbanski's documentation with Hartman's and decide if Urbanski's was superior and whether the evidence suggests Select's reasons for eliminating Hartman's position are pretextual.

There is evidence that Hartman and Urbanski were similar. The primary differences were age, education, number of years of experience and hourly rate. Although Hartman's hourly rate was higher than Urbanski's and she did not possess a master's degree, Davis testified that hourly rate and education were not factors in their decision.[106] A reasonable jury, looking at the inconsistencies in Select's reasons for retaining Urbanski over Hartman and the lack of other possible reasons for their decision, could conclude that the real reason was age.

There are also inconsistencies in Davis's testimony about who was involved in the decision to retain Urbanski over Hartman. On several occasions, she testified that she, Serene and Human Resources made the decision.[107] At other times, she testified it was

---

[104] Hartman Dep. Tr. at 50:24-51:12; Davis Dep. Tr. at 146:24-147:4.

[105] Hartman Dep. Tr. at 51:22-52:2; Davis Dep. Tr. at 146:17-23.

[106] Davis Dep. Tr. at 54:18-20, 94:18-95:3.

[107] *Id.* at 53:13-15 ("Q: … [W]ho was involved in that decision? A: Shelly [*sic*] Serene, myself and HR"), 98:15-99:2 ("Q: Who else was involved in that meeting? A: As I've said before, HR").

her and Serene.[108] Serene informed Hartman that it was an "HR decision" and "nothing personal."

As previously discussed, Susan's retention as occupational therapist at Towne Manor West militates against an inference of age discrimination. Select chose to retain Susan, who is in her late 50s, and reduce Shiney, around age 40, to part-time. Nevertheless, the two occupational therapists that were reduced to part-time work through Select's reduction-in-force, Hartman and Shiney, are both members of the protected class, supporting an inference of discrimination. Viewing the facts in the light most favorable to Hartman, a reasonable jury could conclude that age discrimination motivated Select's decision to eliminate her position.

<em>Motion for Leave to Amend Complaint</em>

Hartman's PHRA claim was dismissed because she had not exhausted her administrative remedies before the Pennsylvania Human Relations Commission with respect to that claim.[109] Hartman has moved for leave to amend her complaint to add the PHRA claim now that she has exhausted administrative remedies.[110] The discovery the parties have completed regarding the ADEA claim is equally applicable to the PHRA claim. *Martinez*, 986 F.3d at 265 ("Our analysis of the ADEA applies equally to the PHRA."). There will be no prejudice to Select. Therefore, we shall allow Hartman to amend her complaint to add the PHRA claim.

---

[108] *Id.* at 155:18-21 ("Q: Well, who in HR helped make the decision to reduce Katie Hartman from full-time to PRN and keep Rachel Urbanski? A: Shelly [*sic*] and I made that decision together").

[109] July 7, 2020 Order (ECF No. 9).

[110] Pl.'s Mot. for Leave to Am. Compl. (ECF No. 23).

**Conclusion**

There are genuine issues of material fact bearing on whether Hartman's elimination as part of Select's reduction-in-force was the result of age discrimination under ADEA and the PHRA. Thus, we shall deny Select's motion for summary judgment.